Students, all rise. Hear ye, hear ye, hear ye. His Honor, the Court of the Second Judicial District is now open for pursuant to adjournment. The Honorable Susan M. Hutchinson presides. Please be seated. Your Honor, this case will adopt it from June of 2014 that the New York Assault Intimidators, Stonecrackers, Inc., individually and on behalf of members of the certified class designated plaintiff, appellee, and cross-appellant, the Milwaukee Insurance Company, defendant, appellant, and cross-appellant. Pardon me on behalf of the defendant, appellant, and cross-appellant, Mr. Robert Hopkin. Pardon me on behalf of the plaintiff, appellant, and cross-appellant, attorney, Mr. Jeffrey Garner. I understand you've worked out time for the cross-appeal, et cetera, with our marshal, so I will simply listen for the bell or buzzer. All right, Mr. Hopkin. Good morning, Your Honors. May it please the Court, Rob Hopkin for Milwaukee Insurance Company. I would like to spend the bulk of my time this morning talking about the main issue in our brief, which is the question whether the settlement between Wholesale and Stonecrafters conforms to the Guillen standard. As we argue, we think that not only entitles us to a vacator of summary judgment below, but to actually an order requiring entry of summary judgment on our cross-motion for summary judgment in our favor. I'd like to have a little bit of time at the end to address our alternative argument regarding policy limits, which would reduce the amount of judgment should the judgment be affirmed, but I'll spend the bulk of my time on the main issue. Turning to that, both as a matter of substance and process, Your Honors, the settlement between Wholesale and Stonecrafters did not conform to the standard of a reasonably prudent uninsured. Now, since this Court last had this case on appeal, the First District decided central mutual, which discusses a number of considerations that bear on the question of Guillen. Practically every factor that points to a settlement's unreasonableness is present here, and Stonecrafters can point only to factors that Guillen and central mutual have concluded fail to establish the reasonableness of the settlement. Let me go through some of those. First, and perhaps most significantly, the settlement allows recovery against the insurer only. This is Central Mutual Paragraph 81. Now, we know that's the case here. It's in the settlement agreement. But we know more than that. On the record in this case, we know that both Mr. Burns and Mr. Crotty testified that it was the most important feature of the settlement, not the amount, but the fact that somebody else was paying. And that- Does that automatically indicate collusion, however? Oh, no, no. I'm not here to say that there's any one magic bullet. I'm going to go through all of the evidence in the record, and I think it puts a pretty compelling case in front of you overall. But it's pretty significant, and the reason why I'm singling this one out is because if you stop for a moment, not only on this record is it clear that the settlement would not have happened without that feature, but it's also clear that that feature, when it's present, saps the incentive for defendants to behave prudently. That's the whole point of GIAN. That's why GIAN exists, so that defendants would have a reason to conduct a reasonable investigation, to expend some resources to figure out what kind of shape the defense would take and what's really at stake in the litigation. But once you're told you're not paying, why bother? Why bother? And that's a very fundamental problem in this case. Central Mutual goes on to say that when the settlement amount is up to coverage limits, that enhances, that's further reason to conclude that it's unreasonable. We know that that's present here. The structure of the settlement matters. Central Mutual talks about the difference between a lump sum payment structure, which happened in this case, and a claims-made payment structure. The effect of that, in this case, is dramatic. When there's a lump sum payment, the money's put on the table, there's a provision for cypre. In this case, we know that cypre, recipient misericordia, a worthy foundation to be sure, is going to receive much more than anyone else. That's just giving away money, not something a reasonably prudent uninsured would do. And of course, there's also the element of concealment, also mentioned in Central Mutual. Here, we're not saying we were entitled to see the settlement, but when Mr. Karate, counsel for wholesale, suggested that it be disclosed to us, plaintiff's counsel said, no, I don't want them to see it. And we know from the history of this litigation how hard they worked to prevent us from being able to challenge the evidence that establishes that this settlement was not one a reasonably prudent uninsured would engage in. Well, I thought... You go first. I thought Central Mutual basically said that concealment was really not an issue because where an insurer breaches its duty to defend, it really has no right to have notice of that. Well, Central Mutual points to cases that says concealment is a factor. I'm not saying that it's anywhere near as important a factor as these others. I'm just trying to go through in a relatively comprehensive fashion to show you that more or less everything that provides a reason to doubt the reasonableness of the settlement is present here. And concealment is part of that. And I will follow up if I can, because that was my first question. My second question is, if your company is saying, we're not going to defend, we're not going to indemnify, why do they want to see it and do nothing else? Why do they want to see it? It's not a question of whether we wanted to see it. What happened was Counsel for Stonecrackers, who understood full well that it was the insurance company's money on the table, suggested, hey, why don't you show it to them so that they know what's happening, so that they know what's coming down, and maybe even get, you know, the obvious implication was maybe you'll get some buy-in from them. They, the plaintiffs, chose to keep it away from us. What would have happened? I don't know. Maybe nothing. You may be right about it. As I said, this isn't the most critical factor. But the point is the plaintiffs didn't want us to see it, and we know from this litigation how hard the plaintiffs worked to prevent us from showing that there isn't a reasonable basis for this settlement. And then third, you knew that, or the company knew this lawsuit was pending, or probably knew because they were tendered and they denied. That's true. What is your responsibility as the company to follow the litigation on your own? Well, of course, without, we don't have any access to the information that they're not willing to give us. You know, there was no, until the settlement agreement was filed and approved, there was nothing for us to see or follow. So, and of course, once we were brought into the case, we have consistently and vigorously disputed the reasonableness of the settlement under the circumstances. So you would follow it to the point, someone from the company would be following the litigation in some way, or? I don't think, I don't know whether that actually happened in this case, and I don't think the record speaks to that directly one way or the other. As an aside, what happened to American economy in this case? So the record doesn't disclose specifically what happened, but what we do know is they were never brought in. You know, all I can surmise is that there may have been a conclusion breached that the policy didn't cover. Well, they had a declaratory judgment action. That's what somebody said in one of the briefs. And I don't see what happened. So they're just not part of this at all? They're just not part of it. And they're not on the hook for the $4 million? That is, my understanding is that is correct. They have not been made, been put on the hook for the $4 million yet, and I think at this point it should have sailed on that. You know, continuing, and this is, I think, particularly important. Central Mutual talks about advocating a true defense. And as I said from the outset, that's really fundamentally the problem in this case. And think about what a true defense in a DCPA case looks like. The plaintiffs want to suggest, well, there's no way you could get out from a judgment. But that's not the only point of Central Mutual and Guillen. Guillen says that their reasonably prudent standard applies, reasonably prudent uninsured standard applies, to the amount of damages agreed to. That's what these TCPA cases are about. Is a class ascertainable? Is there a way to defeat class certification? Is there a way to bring down the amount of exposure in the case based on the evidence? And this case is particularly powerful in that respect. And we know that from plaintiff's own brief. If you look at page 22 of plaintiff's brief, they say there's a fax log or a record. The record shows the names of all the people who were sent faxes. There's no citation in the brief to that. That's typical in most of the cases they cite from the TCPA cases. There's a fax log or some kind of electronic record or some kind of agreed conclusion as to the amount and targets of the faxes. But that's not here. And in fact, not only is it not here, when Mr. Crotty was asked during his deposition, when this settlement was going on, when these discussions were going on, did you reach out to Village E-Docs and contact them? What kind of records did they have? He said, no. That's an A737 in the record. This is the fundamental problem. There was no effort made to put on a defense. And in fact, and so they simply rolled over to the most distracting... Was there some indication that Crotty said that he wouldn't have put something in his affidavit if he hadn't checked it out? There was testimony to that effect. But all he said was, you know, there's some basis for this assertion. But what he didn't do is invest, and there's no indication in what he said during his deposition, what he looked at, who he asked. So he signed on to the number that is the largest number possible, the number from the database. But we know from Mr. Burns' testimony that the database was winnowed. And of course, the broadcast summary, which they want to wave around now, and I'll get to that in a second, that doesn't have that number of faxes at all. That played no role in the case at all. He just accepted the claim that an investigation, a reasonable investigation, would have uncovered. And this is important, too. I'm not asking for that much. We're not saying that there has to be a full-blown defense put on. We're not saying that the plaintiff had to show that they would have had a perfect case, either. What we're saying, this can't be enough. And let me illustrate with the final fact that I think is particularly important. Cedric Mitchell talks about negotiation on damages. Let's look at what happened with respect to damages in this case. There was an initial demand for $4 million back when they thought American economy was the only policy at issue in the case. Then they learned about our policy, and the demand goes up. So not only is there no negotiation on damages, no pushback on the amount of recovery at all, the amount of damages goes up in the negotiations on the basis of literally nothing other than the presence of an additional insurance policy. That is, there's no more clear statement that this case is special and different and clearly implicates the policy that Ian is meant to advance. It cannot be the case that it satisfies Ian when settlement amount goes up on the basis of nothing more than the presence of an insurance policy, nothing about the case at all. Why do you think you're entitled to summary judgment? Because we think that there's no factual dispute about any of the facts that I've discussed here, and that when you're left with this, this can't be, and this is the bottom line, the record on this case cannot be what satisfies Ian. If it is, Ian's a dead letter. Ian does nothing. Ian is just a matter of the plaintiff reciting certain magic words. Well, but you have a database of 20,000. I mean, and let's assume, and the broadcast summary is there, and there is some testimony relating the broadcast summary to the 17,000 number on the invoice. I mean, Crotty does, I'm sorry, not Crotty, Richard does say that it, I think the words he used were, it translates reasonably. I'm just saying, these are things that are of record, so my question to you is not whether summary judgment was appropriate for them. Why is it appropriate for you when you have things in the record that are factually disputed? Well, let's talk about the broadcast summary then, because that's what the circuit court clearly hinged on. The reason why I haven't talked about it is because for a number of reasons. One, it's not been authenticated. There's nothing in Richard's testimony that actually says this broadcast summary is what plaintiff's counsel says it is. There's nothing on the document that says it. Richard can't identify it or connect it with this client, with Wholesale Life at all. The comment that you're referring to comes right on the heels, right on the heels of when plaintiff's counsel, unable to get Richard to authenticate this document, says, well, assume that this is Wholesale Life's document. If you assume this is Wholesale Life's document, then is it consistent with the 17,000 minute invoice? And he says, yeah, sure. But that's not authentication. That's, and in fact, it's the opposite of authentication and it's more, it's more or less an admission that it's not authenticated. If you have to assume the document is what plaintiff's counsel says it is, you haven't authenticated. Karate testified, I thought he testified that he got it from his client. He testified that he couldn't remember much about the broadcast summary at all. It was in his files, that's it. And remember what it's, the nine pages that are connected to it. It's nine pages of phone numbers that everybody admits has nothing to do with this case. Richard actually says, we don't produce anything like that. There's no, the numbers from that nine pages have nothing to do with this case. But the number of faxes, the number of phone numbers on that list has nothing to do with this case. So again, it looks, you know, there's nothing in there suggesting that this is anything but something that was found in Karate's files. That's it. And I think, you know, at that point, you really have nothing to go on. I think it was error to admit the broadcast summary. And that's without regard to reaching hearsay problems with the document as well. Because of course, the fact that it was in Karate's files, which he received from, even if it's true that he received it from wholesale, that doesn't overcome the hearsay objection that we have to the admissibility of the document. How much authentication and foundation does one need at this point in the proceedings? And we're talking about, you know, a reasonable misdetermination for a settlement by the trial court. And then a summary judgment on this proceeding. You know, I mean, certainly, let's say we accept your argument that summary judgment was inappropriate for, you know, plaintiff in this case. Why would it then turn around and be summary judgment in favor of you? Why wouldn't it just go back for a hearing where all these things would have to be proved up, you know, pursuant to rules of evidence? Because, well, let's start with this. I don't think that the rules of evidence change just because we're in a Guillain proceeding. The rules of evidence are the rules of evidence. And this document is no evidence at all, on the merits of the underlying claim or whether we're in a hearing about the reasonableness of the settlement under Guillain. You can't change the rules of evidence. You can't say, well, you know, I understand there's a practical matter. It feels like it's different. But it isn't. From our perspective, it's the same. And so once you take the broadcast summary out, there's literally nothing to go on. And I, you know, I haven't heard from plaintiff's counsel. And I don't think even with the broadcast summary, you can go on, you can go forward on a trial. Because remember, this is about the reasonableness of the settlement. We know the broadcast summary played no role in the settlement at all. There's no reference to it during the settlement negotiations. There's no discussion about it. The numbers from the broadcast summary are not reflected in any document. When did it first arise? In these proceedings. It first came out during discovery in these proceedings. Your Honor, I see that I'm out of time. I have a question. Sure, please. All of the factors that you've identified, that you say have been, I would say, listening to your argument, grossly overlooked, could have been addressed if, at a minimum, your client came in and defended with reservation. Your Honor, I understand. You're asking now for summary judgment that would wipe everything out, allegedly. But you could have had everything you're asking for had they defended with reservation. Your Honor, I understand. And I think, you know, as a general policy, that's the way we would proceed. We had reasons not to do so. I mean, obviously, the law changed on us during this, during the underlying case. And that's, you know, and that's the way it goes. But the one thing I can say is Guillen itself assumes that the insurer is absent. Now, we had a reason to be absent, and that means, and that goes to the policy limits question. It wasn't a bad faith refusal to defend, but I don't really have much more than that to say about it. Our brief is very, very clear on that issue, and I want to make sure that you're aware of it, that in the absence of any allegation or proof of bad faith, our policy limit holds. But Guillen assumes your question. You don't get to the Guillen question unless there's been a wrongful failure to defend, a wrongful failure to defend. So that's... So this is a license then to not, Guillen is a license not to defend? It's not a license anybody wants to take. Look, I don't think, you know, it's not like, precisely because I don't think you have to do very much to satisfy the Guillen standard. It's just nothing was done here. Nothing was done here. And you do lose policy defenses when you don't defend. That's a big, big loss in a lot of cases. So you're not throwing the doors open to make insurance companies better off by refusing to defend. If in this one case, on this record, which is barren of any evidence that the defendant in this case conducted anything resembling the kind of investigation a reasonably prudent uninsured would have conducted. This is a special case. There hasn't been a raft of cases like this. The record is rarely, like, rarely this strong for the insurer. But Guillen exists so that when it is, we're entitled to judgment. Thank you, Your Honor. Thank you. Mr. Berman. Thank you, Your Honor. May it please the court. My name is Jeffrey Berman. I'm here today on behalf of Stonecrafters Inc. Plaintiff Jeff McCrudder, cross appellate, the party that won below. To start off, Your Honor, I would say you're absolutely correct. The policy of the state is that insurers should defend wherever reasonably prudent. And when they choose to deny coverage outright and stand on the sidelines, they take a risk that something like this can happen and that they will end up without the ability to assert defenses to the claim of liability at the end of the day. And that's precisely why we're here. Now, as you know, this case was up here before on an interlocutory appeal. After the interlocutory appeal was decided and the case was remanded, the parties engaged in discovery. They had every opportunity to develop a broader record than is before the court if they thought that there were things to do. And what he and its progeny says is, yes, there's an obligation to demonstrate that the underlying settlement was reasonable in order to make it enforceable. But once the proponent of the settlement comes forward with a prima facie case, the burden shifts to the insurer to rebut that evidence. And while counsel makes a broad showing of how this case, there's nothing here in the record, I would beg to differ. We brought forward a significant amount of evidence before the trial court. Does Central Mutual say, though, that reliance on what Central Mutual called an overblown exposure or potential exposure means that the proponent has not made out a prima facie case? I believe that Central Mutual used that phrase. So I'm not going to dispute the phrase in particular. But what Central Mutual says is, you have to look at the complete picture here. And that was one issue that it took a look at. And it decided, and I've known Judge Mason since before she was on the bench, and she's a very intelligent and wise, was a wise lawyer, and I'm sure she didn't mean that the fact that there is a potential for liability under the statute at $500 for facts is an irrelevant factor. It is perfectly appropriate for the insured to take into account the fact that they are facing statutory damage liability of $500 per fax in concluding that it is or is not, depending on the circumstances, a wise decision, reasonable and prudent, to go forward with a settlement in the case. Wouldn't the prudent person, though, want to know, to have some idea of how many faxes there are? Well, and that's a great point, Your Honor. The problem with the record here isn't that the insured didn't know how many faxes were sent, at least in the ballpark. It knew that it was billed for a certain amount of minutes. It also knew the size of the list that it sent to the fax broadcaster, and it knew roughly the amount of time it takes to send the fax. So simple math tells you roughly what the number of faxes are. It also had, and we'll disagree a little bit with counsel here, it had in its file, and the record reflects this, the broadcast summary report that shows the number of successful transmissions. Now, we can get into that summary report in a minute, and I don't want to jump all over the place, but the fact is that the question of admissibility, and I think, Your Honor, Judge Burke, you touched on this a little bit. The question here isn't whether we have an obligation to prove in the context of a Guillen settlement the absolute liability of the insured, nor is it the insured's obligation to prove when it was decided whether or not to settle that it knew to an absolute certainty how much it was exposed. But here it had indicia that it was going to be exposed or it could be exposed to somewhere between $8 million and $30 million in statutory damages, and maybe that number will shift a little bit. Half a million here, a million there. Eventually that adds up to real money. But the fact is that when you're asking, you're looking prospectively, and you look into that crystal ball, Mr. Insured, and you're deciding whether or not it makes sense to go forward with a settlement, do you have enough information to make a rational decision on what you're facing? And I would respectfully suggest to you that when you look at the totality of the record here, as did the trial court, and you have the information regarding the relationship between the insured and the broadcaster, the documents that are not in controversy, including the invoice for the amount of minutes used to send the broadcast, and the other information that came, the documents that came back that Mr. Richard said were his company's documents, along with this additional piece of information, which is the summary report, that the insured had ample information to decide that it faced some level of significant exposure. It's not overblown to say, I'm facing some millions of dollars in liability. Well, they had an idea of the number of faxes that were sent based upon a list of 20,000, based upon the invoice of 17,000. I understand that point, but wouldn't a reasonably prudent uninsured want to have some idea of the number of claimants that were going to come forward? Is it really just a matter of how many faxes were either sent or received without an idea of the number of claimants? I mean, Central Mutual talks about a 10% claimant rate, which is fairly normal, apparently, in these cases. Well, but honestly, Judge, you're looking prospectively. You can't know until after notice is sent out and the claim forms are sent out after the settlement exists. The settlement could be, we're going to pay so much per claim. Apparently, Karate wanted to put into this thing that you couldn't be a claimant unless you came forward and said, here's my fax or here's my proof. And apparently, that was denied by your side and then it just went forward without it. Well, and at some point, a reasonable uninsured, because that's the test on your DNA, says, I'm negotiating the best deal that I think I can negotiate at this time. If the plaintiff won't agree to that term, that doesn't inherently make the settlement unreasonable. No, but wouldn't I, if I'm spending millions of dollars of my money out of my pocket, wouldn't I want to know how many claimants are going to come forward? At least a ballpark of how many claimants are out there that are going to want their 500 up to $1,500. If circumstances permit you to find that information in advance, certainly you might want to know that information. But in the context of the case, you can't know it if the plaintiff says, on today's date, where we're at, I'm offering you a settlement at roughly 50% of your minimum exposure on statutory damages. So I'm giving you this deal and that's the deal I'm giving you and we can talk about other terms. And they did and they negotiated terms back and forth. And, but when the plaintiff says, look, I'm not going to give you this, what we'll call a claims-made settlement scenario in this context, then the insurer, the question then shifts to, well, does the insurer have the right now to come in after the fact and question, as a Monday morning quarterback, the decision of the insured to say, look, I have 50 cents on the dollar settlement. That's okay by me. And that's what happened here. Does a rational uninsured or rational party settle at 50% of liability when you're facing a claim under a strict liability statute? How is this 50%? I mean, it was about $8 million. We're at $8.3 million for the $500, which would be, and this is based on the broadcast summary, which we don't even know if that number's correct. I just know it was under $8.3 million. We settled for six. How's that 50%? I'm looking for my calculations here. If it, well, it depends on how you calculate the numbers. But at 16,674, which is the number of the broadcast summary, that's 8.337. If it had been troubled, it goes to 25 million. If you go based on sent fax, sent faxes rather than successfully received, and there is case law that says that the TCPA liability attaches based on sending, not receiving, and we've cited those in the brief, then the potential exposure ranged somewhere between 10.4 and 31.2. So using those numbers, six million is roughly 57% of the $500 per fax sent. And I'm sorry, I said 50, it's 57%. I stand corrected. Or 26% of its exposure at $1,500 per fax. In essence, what Wholesale Life negotiated was a settlement for less than $400 per fax received by members of the class, well below the minimum $500 per fax statutory damages available under the statute. Now we could say, and certainly the insurer has said, we could have done better. We could have gotten a better deal. But that's not the test, Dr. Guillen. The test is whether standing in the shoes of this insured, the insured made a rational decision and a reasonable decision to go forward on this basis at $6 million.  again, contrary to what Learning Council suggested to the court, it's a testimony from the defense counsel who said, I looked at this case, I made a rational assessment of, would the class be certified? Would there be liability? What is the potential range of liability out there? And I concluded that it was rational, reasonable and appropriate to settle this case. And that this number made sense because of the potential exposure here and the ability to cut it off. But doesn't it, assuming he looked at those factors as he testified, isn't there another important factor? Who is going to actually come forward? I mean, that's the whole point. Who is going to come forward? They're gonna have to prove somehow who saved those faxes so they can prove or can they do it by phone number or by fax number? I mean, that's another pretty important factor, isn't it? Typically, in these cases, when they settle, particularly, we don't agree to a requirement that the recipients have to come forward with a copy of the fax to prove that they received it. There's often indicia that we can use to create the parameters of the class. And that tends to be the list to which the faxes were sent. So we identify the fax recipients based on the list. Here you have the manufacturer's list that was purchased by the insurer, provided to the fax blaster, that formed the basis of the blast that went out. That's how you identify the people who received the fax. So someone who has a phone number where the fax was sent, but it's not even a fax machine, could theoretically get the 500 bucks even though they don't even have a fax machine. And that's a great question. And the reason is the policy behind the statute is that we, Congress, decided that the nuisance and disruption and cost of tying up phone lines, telephones, fax machines, is something that they chose to address with the statute. So whether you have a machine at the end of the line or not, it's going to tie up your line. It's going to interfere with your use of your property. Now, temporarily, and it's not destroyed, that is typically part of the definition of property damage under a policy is either the loss of use of property that is not destroyed or the loss of property that is destroyed. Here, Congress made the decision that we believe that this is so egregious a practice to send these unsolicited faxes that we are going to create a statutory liability because you tied up that line. Right, where they wanted to fairly compensate the people who were put out by this, fairly compensate those individuals, and also deter future conduct by this company and other companies so situate, correct? I'm just wondering where the $2 million attorney's fees comes from. I mean, you're looking at a situation where, in this case, 1,300 people come forward for a $700,000 reasonable compensation to those individuals who were harmed. And then a reasonably prudent uninsured would say, you know, I'm going to pay those folks $700,000 and then out of my pocket, I'm going to pay attorneys for the class $2 million and I'm going to pay a charity $3.3 million. I mean, again, we're at summary judgment stage. We're not at whether this is factually reasonable or not. We're at whether there's a material fact whether it's reasonable or not, question of fact whether it's reasonable or not. That's where we're at right now. And you're telling me that that situation doesn't raise a material question of fact as to whether or not it's reasonable. I would say, succinctly, no, it does not raise a material issue of fact. And that's because we're looking, again, at the circumstances being retrospective instead of prospectively. And what Guillen says is you look at the question from the insurer's perspective at the time they made that decision in the context of what the plaintiff and the plaintiff's lawyers would agree to on behalf of this class. Let's look at a fact that was taking place right then. Counsel indicated that there was a $4 million settlement offer on the table at some point in time. And then when your side found out there was another $2 million policy out there, that settlement offer went up to $6 million. And then you ended up settling for two cents shy of $6 million. I mean, is that correct? I would say that part of it is correct, part of it is incorrect. It engages in speculation. The record suggests there was a $4 million settlement at some point that was not accepted and later there was an almost $6 million settlement. The question of what motivated that change is not part of the record. The $4 million was out there when there was no insurance involved, apparently? And this company that sent the faxes out said, no, we can't pay $4 million. Is that what happened? No, that's not exactly what happened. And so I'm trying to be as factually correct as I can be, given that I wasn't there. What the record suggests is that there was a $4 million settlement offer made and was not accepted. By wholesale? By wholesale, yeah. And that later a $6 million offer was made or just shy of $6 million. The wholesale or... Milwaukee. Milwaukee, thank you. You need a scorecard to keep track of the players. Milwaukee has speculated that that is based on the availability or the limits of total coverage. I would say that that's not substantiated in the record, but even if it were, that isn't an overriding fact because think about it from the perspective of the plaintiff for just a moment. They're looking at this and saying, all right, I'm going to take this I-don't-collect-from-you settlement scenario and I'm going to go after the funds that may be available from other sources and I have to go to a court and tell them that this is reasonable from the perspective of the class. And so what I'm going to do is I'm going to tell that judge in the underlying settlement approval process that I'm looking to maximize the availability of resources to the class and that I've tied the judgment to those resources and that I'm not just going to throw out a number that's much larger than that. But tying it to those resources is exactly a fact that Central Mutual talked about as indicia of collusion and that is strategically implicating coverage up to the maximum. Here you don't have just strategically implicating coverage up to the maximum. You apparently have a $4 million settlement when everybody thought there was $4 million in insurance that then rises to $6 million when you find out there's $6 million. I mean, talk about strategically implicating coverage up to the maximum as indicia of collusion. I'm not saying it was collusion. That's up to the ultimate fact finder. I'm talking about whether there's a material question of fact on the issue of collusion as it relates to strategically implicating this coverage in such a fashion. I know I'm long over my time limit but can I talk about Central Mutual for just a moment? We've talked a ton about Central Mutual. I want you to answer my question. Okay. I'm sorry, maybe I lost the question in the way you phrased it but I believe that Central Mutual doesn't say that the mere fact that the settlement amount mirrors the amount of available coverage says that this is a collusive sum. No, I'm not saying it doesn't. And that fact was before the trial court. Right. And that's why we're reviewing it de novo. Okay? I understand that. It was before the trial court. The trial court ruled a certain way. You won. We're here now. We're here de novo on summary judgment review. So we're looking at it afresh. So we are sitting like the trial court and move. And I know Central Mutual doesn't say that because you could very well go back to the trial court if this happened to be reversed and have your reasonableness hearing, prove it up, and have a hearing and now you're at a different stage. You're not at summary judgment. You're not at material questions of fact. You're probably manifest weight, I would imagine, at that point in time. Okay. I'm sorry. Well, I'm just saying Central Mutual doesn't... I realize Central Mutual doesn't say that these things are written in stone. This is a reasonableness thing. It's a factor, though, that we should look at according to Central Mutual. And it's certainly on a determinative one. Even if you decide that that was the reason that it was a $6 million settlement, that doesn't tell you that the settlement is collusive. And I would suggest to you that the remainder of the scenario that was at issue in Central Mutual is nothing at all remotely like the scenario presented here. And that's what I wanted to talk about. But the scenario presented here, as I heard my colleague, is we have a $4 million offer that's denied and now we go up to almost $6 million. It's not that you're going to policy limit. It's just, well, let's wait and see what's better and maybe we can find something that's better. And that creates a concern under most of these cases, I believe. So how do we respond to that? The answer to the question of the two different settlement offers is very simply that an offer was made, it was not accepted, and at a later date the plaintiff made a higher offer, it was accepted. 50%? Yes. And the record is not developed. I will say that as to why that happened. But there were plenty of opportunities for counsel to develop that record in the trial court they chose not to. They didn't avail themselves of that opportunity. And so what happened here is you have this settlement scenario where the plaintiff said, I want $6 million as the number on the judgment, or 5999. And in the course of negotiations, that was ultimately accepted. That was one small piece, or one piece of a larger puzzle. And that's what distinguishes this scenario from that in Central Mutual. Because in Central Mutual, what the court was looking at is a scenario where, first of all, the insurer was defending. He was paying for the defense. It had not breached its duty to defend. It had not left the insurer on its own, as Your Honor pointed out, and then came in later and said, well, I should have gotten a better deal. But the real thing that troubled the court in Central Mutual was the circumstances surrounding Greg Ellis, the lawyer selected by the insured to substitute for the lawyer chosen by the insurance company, who then misled, lied, deceived, failed to inform the insurance company of material facts relating to the defense of the case and ultimately the settlement of the case. And that's what the trial court in that case found to be very troubling, was the fact that Mr. Ellis did not inform the insurance company about what was going on when he had an obligation to do so, because they were paying the defense. He did not inform them of the settlement. He did not transmit the settlement to them. And although you're correct, Justice Burke, that the duty to inform was not ultimately material to the outcome in that case, that was one of the issues that they found to be troubling, was the fact that Mr. Ellis seemed to be non-adversarial with the plaintiff's lawyer. He got involved. It was just weeks later that the settlement came out. They were discussing settlement before he had an appearance on file, and he never told the insurance company about that. He misrepresented to the court in the fairness hearing the circumstances of the settlement. And so the court said, there, we have a real problem with this totality of scenario. None of that is present here. Mr. Crotty doesn't have a relationship with plaintiff's lawyer. He didn't make any misrepresentations. He didn't do any of the things that Mr. Ellis is asserted to have done and created a cloud in that case. Well, Mr. Ellis withheld information. It might be said that Mr. Crotty didn't look for much information. I mean, I don't see a significant difference in those. The case had proceeded for approximately 18 months. The record doesn't say he didn't look for information. The record says that he testified that I made an evaluation of this case of the defenses, of the facts, of the circumstances, and I made a recommendation to my client. And that's what he told the court. That's what he testified in his deposition. If there was something they wanted to cross-examine him on, they were there, or their predecessor counsel was there at that deposition. Milwaukee was represented at that deposition. They didn't develop that record. What we have is Mr. Crotty's unrebutted testimony that I made a fair and complete evaluation of this case and found that the liability was likely, class certification was likely, that this settlement scenario was reasonable and rational. None of that was present in central mutual. So I think we've overstated central mutual's applicability here. I know I'm way over my time. Thank you. Thank you very much. Mr. Hoffman. Thank you, Your Honor. I'll try to be brief. I know we've gone very long. On the question of the settlement offers, first of all, they're just days apart. I mean, there's no way, and there's no suggestion in the record that anything happened between those two offers that provided a justification aside from the discovery of additional insurance company and insurance company In terms of knowing how this policy, how this number came to be, at A249 in the record is the motion for final approval of the settlement. And at the bottom of that page, it recites that the defendant has no real ability to pay the damages. And then it recites the Milwaukee policy with its $2 million aggregate limit and the American economy policy with its $4 million aggregate limit. So we know from the record, it's not speculation, we know exactly where the number came from. As far as it relates to the numbers, you know, the number of faxes received, sent, claims made, and all that, I mean, counsel's argument to some extent is that we can't engage in Monday morning quarterbacking. We have to look at the scenario as it was at the time when counsel settled. Understood. Counsel for the defendant settled. So, I mean, address that issue. Yep. Because looking at it in light of central mutual, some of the things in there about the side prey and all that, at the day of the settlement, we wouldn't know what the side prey was. Right. But what I will say about this was a couple of things. First of all, we do know, because claims made settlements are routinely different in terms of how they operate than these kinds of lump sum settlements. We know, with rough estimation, what kind of response you get to these notices that, to file claims. You know you're going to get, you know you're going to pay a lot less with a claims made settlement. And what's driving the desire for a lump sum settlement on the plaintiff's side? Well, I think, again, I'm not talking out of school gear. Everybody knows how this works. The attorney's fees award is much more easily justified when it's a lump sum settlement. It's one-third of the recovery. One-third of a $600,000 recovery is a lot less than one-third of a $6 million recovery. That's known. We know that that's driving this. In terms of, but I want to address the key thing about this Monday morning quarterbacking because I think that's really the difference between, you know, potentially a remand for further proceedings and vacating summary judgment rather than entering summary judgment in our favor. And here's the way I think about it. These cases are really turned, and we cite this in our reply brief, we cite the cases in our reply brief at page 11 about the denial of class certification, these TCPA cases. And they turn on the ascertainability of the class. And what you heard counsel say is, well, there was a lot of smoke out there, but there were a lot of potential claims. But that smoke is just smoke. We don't know who they are. The class, at the class certification stage, this would be a very good case to defend because of the lack of ascertainability of this class. Yes, there was a CD-ROM, but the testimony is it was winnowed. It was narrowed down based on the number of employees of the various organizations. Yes, there's the broadcast summary, but I've gone over why the broadcast summary shouldn't count for anything in this case and didn't count for anything at the time of the settlement. He says there's simple math to do here in terms of multiplying. But their math is all over the map in their brief. We do know the number of billed minutes. Are you saying that even though that broadcast summary apparently was available to the parties as they talked about this? Maybe. I don't know when it popped into his files. I don't know from where it came. He said it was in his files. He didn't... He said it was in his files when he transported his files to counsel for this proceeding. But that doesn't tell me anything about when it got in there. And again, there are those nine pages attached to it that have nothing to do with this case at all. Those got in there too and they're not about this case. So, I don't know what the condition of those files were at the time of the settlement, which is exactly what authentication is about, robustly. So, we know about the invoice. 17,000 minutes were billed. But we know from Richard that line issues can affect that and that there are retries and the system is defaulted to retry three times. The point is, the real point is, these cases, when they get litigated as a class and they go to judgment and you get the big $500 times a big number, you've got a fax log. You've got, you know who you're dealing with so you can certify a class and you can figure out who gets paid. Here, we don't. There may have been some reason to believe, it's not just Monday morning quarterbacking, even though there may have been some reason to believe that there was some reasonably substantial number of people. The range is substantial in itself, but more importantly, who we're talking about. Who we're talking about is something that could not have been determined, which would have been a critical level to defeat class certification. If a reasonably proven uninsured were defending this case, that would have played a substantial role in reducing the recovery on this side. And I just want to conclude, Your Honor, I know I'm over time, but I want to conclude. If Your Honors do choose to remand for further proceedings, I do urge that you address our policy limits of argument. This case has been going on for an awfully long time. We should have the certainty of our coverage limits in this case, and I do think it can have a substantial impact on what would hopefully be, if this Court is not ready to bring this case to an end at this point,  it could be brought to a quicker end if our policy limits were actually brought back into effect and recognized as controlling in this case. Thank you, Your Honors. All right. Mr. Perlman. Thank you, Your Honors. I appreciate the courtesy, and I will try to be as brief as possible. Two bullet points to respond to what was just said before I turn to the cross-appeal.    is reserved for it. Okay. Thank you, Your Honors. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. The cross-appeal simply put is to ask this Court to revisit the question that was decided to the US Compliance Company. We acknowledge that point. We believe that US Compliance should not be followed in this case, but instead we should follow the decision of the Fifth District and Farmer vs. Country Mutual. The trial court believed it was bound by US Compliance and it made its decision on that basis on the motion to reconsider. We understand that. We're not saying that he was wrong. We're saying that this Court has the ability to revisit the question and should do so. And to conclude that  decision is not a bonus. It protects the value of an award from diminution caused by delays in payment. That fundamental purpose is thwarted when an insurer who is contractually obligated to pay interest can nevertheless delay payment of an underlying judgment for more than a decade without any consequence.  policy at issue requires Milwaukee to pay as a supplementary payment all interest on the full amount of judgment that accrues after entry of the judgment against the insurer.  insurer is obligated to pay the judgment which was in May of 2005. And that would be the settlement? That's correct. The judgment that was under as a result of the settlement was in May of 2005. And what Gideon tells us in his progeny is that a settlement judgment of that type still is an obligation of the insurer to pay and that's why it's covered or why it is potentially covered. All of these cases over the years have turned on the notion that even a judgment entered as a result of a settlement with a covenant not to execute against the insurer itself remains an obligation of the insurer for purposes of insurance coverage. And that's no different here when you apply it to the statutory interest because there's no difference in legally obligated to pay or legally obligated obligation of the insurer for the benefit of the class. Okay. So would it get divided into each claimant would get more money or would they just get the $500? Potentially the claimants would get over $500. They would get $500 plus interest. Plus their interest. Yeah. That's what happened. And then the $2 million would get interest and the $3.3 million would get interest. Potentially so. That's correct. And this Court has said in In Re Marriage of Scafuri which we've cited in our briefs that an award of interest is mandatory. So as we discussed in the brief, the Court of U.S. Compliance may not have fully taken into account the mandatory nature of post-judgment interest under the statute. The fact that the insured was legally obligated to pay that interest as a result of the entry of the judgment even the settlement judgment and the fact that the insurance policy there as it does here provides coverage for post-judgment interest. And that was the decision of the Fifth  in Farmer versus Country Mutual where the Court specifically held that the insurer is liable for all interest from the date of the underlying judgment against the insurer. The insurer in that case's policy language was identical to the policy language at issue in this case. And facing essentially the same question of what post-judgment interest the insurer owed, the Farmer Court reasoned that we must look beyond the Country Mutual judgment applying post-judgment interest rules in light of the insurance policy provisions in question to give the judgment its just effect. In that regard, the Farmer Court relied on the Supreme Court decisions in River Valley Carthage versus Hawkeye Security. In River Valley, the Supreme Court was called upon to interpret a clause in that insurer's policy obligating the insurer to pay all interest accruing after the entry of the judgment. And the Supreme Court held this language created liability for interest on the entire underlying judgment. I'm not going to exceed my time over you to say, Your Honors, there's no merit to the effort by Milwaukee to escape the consequences of its breach and that this court should affirm the trial court's correct decision that the underlying settlement was reasonable and enforceable. I thank you for your patience and your time and your consideration. MR. HOCHMAN. Just very briefly, Your Honors, on the policy on the accrued interest limit, this Court's decision eclipsed, in our view. Answer the question. Nothing has changed since then. There's no reason for this Court to modify it. As for what Guillen says about the legal obligation to pay, if you will, the legal obligation to actually pay anything by anyone under this kind of arrangement until the judgment is entered against us, and that's when we think, correctly, under Eclipse, interest should run. MS. PEPLAUSAN. What did the trial court say about